# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-0610V
UNPUBLISHED

|  |  |
|---|---|
| CARMEN TEUFEL,<br><br>          Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>          Respondent. | Chief Special Master Corcoran<br><br>Filed: November 9, 2022<br><br>Special Processing Unit (SPU);<br>Ruling on Entitlement; Findings of<br>Fact; Prior Pain; Onset; Influenza<br>(Flu); Shoulder Injury Related to<br>Vaccine Administration (SIRVA). |

*Harrison Whitten Long, Rawls Law Group, Richmond, VA, for Petitioner.*

*Christine Mary Becer, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On April 24, 2019, Carmel Teufel filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on September 22, 2016, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find it most likely that Petitioner's shoulder injury would not be explained by her prior medical history; that she suffered the onset of shoulder pain specifically within 48 hours of vaccination; and that she is otherwise entitled to compensation. Accordingly, Petitioner's Motion for a Ruling on the Record (ECF Nos. 36-37) is GRANTED.

## I.   **Relevant Procedural History**

The claim was initiated in the spring of 2019, and relevant medical records were filed thereafter. ECF No. 12. Approximately 13 months later, on May 28, 2020, Respondent filed a status report stating that he had reviewed the case and was not interested in settlement. ECF No. 21. Respondent instead proposed filing his Rule 4(c) Report in 45 days. *Id.* He did so, arguing that Petitioner was entitled to compensation because "the record does not establish that petitioner suffered SIRVA because her onset of pain pre-dated her vaccination." Respondent's Report at 5, ECF No. 22. Respondent also stated that Petitioner failed to meet her evidentiary burden of establishing that the flu vaccine in-fact caused her shoulder injury.[3] *Id.*

I ordered Petitioner to file an expert report to address Respondent's claims. Non-PDF Order dated Oct. 26, 2020. In response, Petitioner filed an expert report prepared by board-certified orthopedic surgeon, Dr. Daniel Carr, who opined that Ms. Teufel's shoulder injury was a result of an adverse vaccine reaction to her left shoulder. Ex. 11 at 4. After reviewing Dr. Carr's report, Respondent stated that he intended to file a responsive expert report. ECF No. 25.

On December 22, 2020, Respondent filed an expert report prepared by Dr. Brian Feeley, also a board-certified orthopedic surgeon. Exs. A-B. Dr. Feeley opined that the flu vaccine was not the cause of Petitioner's shoulder and arm pain, but rather, Ms. Teufel had symptoms that were more consistent with a pre-existing cervical spine pathology and arthritis. Ex. A at 11.

Thereafter, the parties elected to brief the issue of entitlement. ECF No. 34. The parties have now filed their respective briefs and this case is ready for adjudication. Petitioner's Motion for Ruling on the Record ("Mot."), ECF No. 37; Respondent's Response ("Opp."), ECF No. 39; Petitioner's Reply ("Reply"), ECF No. 40.

---

[3] Respondent did not specifically raise or argue in the Rule 4(c) Report that the onset of Petitioner's shoulder pain fell outside of the 48 hours window in order to establish a SIRVA injury. Respondent simply stated that the onset of Petitioner's shoulder pain pre-dated her vaccination. A history of pain in the affected shoulder and the onset of shoulder pain after vaccination are two separate criteria necessary to establish a SIRVA Table injury. The argument that the onset of shoulder pain occurred outside of the 48-hour window is first raised in Respondent's Response to Petitioner's Motion for Ruling on the Record.

II.     <u>**Relevant Medical History**</u>

    A. **Medical records**

        *Pre-Vaccination Medical History*

On March 1, 2016, nearly seven months before receiving the vaccination at issue in this case, Ms. Teufel (age 80) presented to Dr. Jerrold G. Black at Doctors Express Urgent Care/Family Medicine with complaints of

> Pain – left side of neck: c[omplains]/o[f] L[ef]t shoulder pain that radiates to L[ef]t side of neck. P[atien]t reports the pain has gotten worse in the last three days. Denies any strenuous activities that may have attributed to pain in shoulder.

Ex. 5 at 14. Ms. Teufel reported that she had constant, although moderate, pain on the left side of her neck and left shoulder for the prior three weeks. *Id*. She stated that the pain was not a result of an injury and that she "had no similar problems in the past." *Id*. On examination, Dr. Black noted "Left trapezius muscle: tenderness noted, which is mild, no swelling, no deformity." *Id*. at 15. No atrophy or tenderness of the left upper arm was noted. *Id*. There was normal active range of motion of the left shoulder. *Id*. An x-ray taken of the cervical spine showed no fractures or avulsions, but did note that the joint space was abnormal, and that there was "interverbal fusion of loss of disc space." *Id*. Ms. Teufel was prescribed Tylenol-Codeine and instructed to follow up with her primary care physician in three days. *Id*. Dr. Black also recommended a soft cervical collar and course of steroids. Ms. Teufel declined those options as she wished to consult with her son. *Id*. at 15.

On March 17, 2016, and again on June 14, 2016, Ms. Teufel was seen at Doctors Express Urgent Care for unrelated complaints, i.e., sinus congestion and complaints of pain in her lower right extremity. Ex. 5 at 8-12. Although "pain in the left arm" is listed in active status, there are no specific complaints of shoulder or arm pain noted during either of these visits. *Id*.

None of the other pre-vaccination records (which date back to 2013) that were filed into the record contain any other mention of left shoulder pain. *See generally* Exs. 5-6.

*Post-Vaccination Medical History*

Ms. Teufel received a flu vaccine in her left shoulder on September 22, 2016, at One Hanson Pharmacy in Woodbridge, Virginia. Ex. 4 at 2-3. Ms. Teufel stated in her affidavit, that the vaccine was not administered by the pharmacist, but by one of the staff

members. Ex. 1 at 1. She stated the vaccine "was administered high in my left arm/shoulder and I felt severe pain immediately which intensified in the hours following administration of the vaccine." *Id.*

On October 18, 2016, less than one month after vaccination, Ms. Teufel presented to Dr. Erica Winslow at Doctors Express Urgent Care/Family Care for complaints of chest pain, hiccups, and fatigue, but also mentioned that she had received a flu shot "and site still tender." Ex. 5 at 4. Petitioner was prescribed Tylenol tabs for five days and instructed to rest from strenuous physical activity. *Id.* at 7.

On approximately November 2, 2016 (Dr. Prinz's handwriting is difficult to read), Ms. Teufel presented to her primary care physician, Dr. Ulrich Prinz, during which Dr. Prinz noted that Petitioner had been seen in urgent care for chest pain, but had also "developed L shoulder pain" upon receiving the flu vaccine in September 2016, and that she could not sleep on her left side as a result. Ex. 6 at 8. He referred her for an evaluation by an orthopedic surgeon. *Id.*

On November 9, 2016, Ms. Teufel presented to Dr. Anthony Avery at OrthoVirginia located in Arlington, Virginia. Ex. 7 at 7. Ms. Teufel reported that she had received a flu vaccine in September which she attributed as the cause of her pain. *Id.* She reported no acute injury and stated that she had not tried any other formal treatment. *Id.* Ms. Teufel identified the pain as located along the lateral shoulder. *Id.* Upon examination, she had full range of motion, normal strength, no instability, and no swelling. *Id.* The assessment listed on this note is "left shoulder myositis following flu injection." *Id.* Dr. Avery noted that "her pain is likely caused by inflammation which should continue to improve… At this time, I recommend that we proceed with a cortisone injection and exercises." *Id.* Ms. Teufel received her first cortisone injection during this visit. Ex. 7 at 8-9. She was instructed to follow up if her symptoms did not improve.

Approximately one month later, on December 12, 2016, Petitioner returned to Dr. Avery in follow up. Ex. 7 at -6. She reported that the cortisone injection she received at her last visit had improved her sharp pain, but she still had a persistent dull pain in her shoulder. *Id.* On examination, Ms. Teufel had full range of motion of the left arm, but with pain at the hyperextension of the elbow. *Id.* She also had a positive impingement and Spurling's test. *Id.* The assessment was left shoulder myositis, and Dr. Avery noted that Petitioner's symptoms "are either coming from her neck or her shoulder given that her symptoms are affecting most of her arm." *Id.* at 5. He ordered MRI imaging of Petitioner's left rotator cuff and cervical spine.[4] *Id.*

---

[4] Ms. Teufel never underwent the MRI of her cervical spine.

4

Ms. Teufel underwent an MRI of her left shoulder on December 16, 2016. Ex. 7 at 10. The MRI showed a "moderate grade partial articular surface tear of the supraspinatus tendon … Mild tendinosis of the supraspinatus, infraspinatus and subscapularis tendons. 2. Superior labral degeneration and fraying. 3. Mild acromioclavicular arthropathy with inferior osteophyte mildly impressing upon the supraspinatus muscle belly." *Id*.

On December 28, 2016, Ms. Teufel returned to Dr. Avery to review the results of the MRI. Ex. 7 at 2-3. She reported that she still had persistent pain in her left shoulder that was mildly improved with the previous cortisone injection. *Id*. Dr. Avery also noted that Petitioner had attempted physical therapy, but it did not provide significant relief. *Id*. On examination, Ms. Teufel's left shoulder continued to show positive impingement signs and she experienced pain during the testing of her rotator cuff. *Id*. Dr. Avery's new assessment was "left shoulder rotator cuff tear likely chronic in nature that was exacerbated by the inflammatory response related to her flu shot." *Id*. He recommended proceeding with conservative treatment, i.e., physical therapy, NSAIDS, and a cortisone injection.  Ms. Teufel received a second cortisone injection during this visit. *Id.*

In December 2016 (as recorded in notes that are difficult to read), Ms. Teufel returned to Dr. Ulrich Prinz, who stated that while Petitioner had attended PT, it "did not help much."[5] Ex. 6 at 8. On January 3, 2017, Ms. Teufel presented to Dr. Winslow at Doctors Express for complaints of a bad productive cough, sneezing, bowel pain. Ex. 5 at 2. There are no specific complaints made about left shoulder pain during this visit, although left arm pain is listed in "active" status. *Id*. at 3.

On October 6, 2017, Ms. Teufel presented to Dr. Avery in follow up for her shoulder injury. Ex. 7 at 14. Dr. Avery noted "[h]er pain began after receiving a flu shot 1 year ago. Her pain is persistent. She states that the cortisone injection gave her slight relief. Her pain is constant… located on the lateral aspect of the shoulder." Ex. 6 at 30. The diagnosis was myositis of the left shoulder. *Id*. Dr. Avery administered a third cortisone injection. *Id*.; Ex. 7 at 20.

Ms. Teufel underwent a second MRI of her left shoulder on October 20, 2017. Ex. 7 at 18-19. The MRI report noted "mild fluid in the subacromial subdeltoid bursa." *Id*. at 19. The impression noted: "rotator cuff tendinosis with few small foci of interstitial tearing in the insertional fibers of supraspinatus. Superior labral tear with small para labral cyst tracking along the superior glenoid rim. Lateral downsloping acromion with small fluid in the subcapsular subdeltoid bursa which may reflect bursitis." *Id*.

On October 25, 2017, Ms. Teufel presented to Dr. Avery in follow up to her left shoulder pain and to review the findings of her most recent MRI. Ex. 6 at 28; Ex. 7 at 15.

---

[5] While Dr. Prinz's handwritten notes are difficult to read, the cited quotations are legible.

During this appointment, Ms. Teufel stated that she was "in extreme pain" and that the pain is "exacerbated with activity and better with rest." *Id*. She stated that the cortisone shot only provided a few days of relief. *Id*. Dr. Avery noted "[h]er pain began a year ago after receiving a flu shot." *Id*. In his assessment, Dr. Avery stated

> It is possible that her chronic labral tearing and biceps inflammation was worsened by the inflammatory response from her flu injection but this is difficult to say given that we do not have an MRI prior to injection.

*Id*. Ms. Teufel was instructed to return if her symptoms worsened or failed to improve.

On December 7, 2017, Ms. Teufel was seen by Dr. John Feigert at Virginia Cancer Specialists in follow up of her chronic lymphocytic leukemia. Ex. 6 at 24. Dr. Feigert noted that Petitioner "had a flu shot last year and has had left shoulder pain ever since. She connects the two, but the MRI of the shoulder does reveal evidence of a rotator cuff tear. So, she is reluctant to do flu shots and this is understandable." *Id*.

On August 3, 2018, Ms. Teufel presented to Dr. Avery in follow up for complaints of shoulder pain. Ex. 6 at 20; Ex. 7 at 17. Dr. Avery noted that Ms. Teufel had received a cortisone injection on October 7, 2017, "that provided relief of her pain." *Id*. However, the pain returned and worsened within the previous two weeks. *Id*. Ms. Teufel elected to receive another (fourth) injection that day. *Id*.; Ex. 17 at 21.

On October 30, 2018, Ms. Teufel presented to Dr. Prinz who noted that Petitioner continued to experience left shoulder pain. Ex. 6 at 1. Ms. Teufel had stopped taking the prescribed Tylenol due to issues with constipation, so Dr. Prinz suggested a trial of Voltaren topical gel. *Id*.

On March 11, 2019, Ms. Teufel returned to Dr. Avery complaining that she continued to have "constant, persistent pain in the shoulder." Ex. 9 at 1. Dr. Avery noted that Petitioner had already received four to five previous cortisone injections, and the most recent injection "did not provide significant relief of her pain." *Id*. Dr. Avery also noted that Ms. Teufel had attempted performing shoulder stretches. *Id*. Petitioner received another steroid injection (fifth) to her left shoulder during this visit. *Id*. at 1-2.

Approximately three months later, on June 7, 2019, Ms. Teufel returned to Dr. Avery stating that she continued to have persistent pain in her left shoulder. Ex. 9 at 3. She complained that "she is losing her balance as a result of this pain." *Id*. Ms. Teufel received another steroid injection (sixth) at this visit. *Id*. at 4. Dr. Avery also ordered another MRI study. Ex. 9 at 7-8.

That same day, Ms. Teufel underwent a third MRI of her left shoulder. Ex. 9 at 7-8. The MRI showed, (1) trace subacromial/subdeltoid bursitis, (2) moderate acromioclavicular arthrosis which had progressed slightly since the last exam, (3) rotator cuff tendinopathy, and (4) glenohumeral arthritis. *Id*. No additional records have been filed since this visit.

### B. Affidavit Evidence

*1. Ms. Teufel*

Ms. Teufel explained in her affidavit that when she received the flu vaccine on September 22, 2016, it was not administered by the pharmacist, but rather by one of the staff members. Ex. 1 at 1. She averred that the vaccine was administered "high in my left arm/shoulder and I felt severe pain immediately which intensified in the hours following the administration of the vaccine." *Id*. Ms. Teufel stated the pain continued for weeks but she hoped it would resolve on its own. *Id*. In late October, after her sister encouraged her to seek treatment, Ms. Teufel scheduled an appointment with her primary care physician to be seen for her shoulder pain.

Despite being treated for her shoulder, Ms. Teufel stated that she still experiences continuous pain in her left shoulder and arm which worsens with use. *Id*. at 3. She receives regular steroid injections to manage her pain. *Id*.

*2. Billie Taylor*

Petitioner also filed an affidavit from Ms. Billie Taylor, who has been friends with Petitioner since 1981. Ex. 2 at 1. Ms. Taylor stated that she spoke with Petitioner several times after Ms. Teufel received the vaccine on September 22, 2016, and recalled that Ms. Teufel "thought the vaccine had been administered incorrectly" and that she was experiencing severe pain that would not subside. *Id*. Ms. Taylor explained that Petitioner "has always been active and able as long as I have known her." *Id*. Ms. Taylor stated that Petitioner expressed to her that she was afraid to lose her independence as a result of her shoulder injury.

*3. Manuelita Walsh*

Petitioner also filed an affidavit from her younger sister, Ms. Manuelita Walsh. Ex. 3 at 1. Ms. Walsh averred that Ms. Teufel complained of left shoulder pain "for weeks after the vaccination", as well as a loss of range of motion. *Id*. Ms. Walsh observed that Petitioner "suffered greatly" and was unable to perform simple tasks that required the use of both arms and hands. *Id*. She stated that the impact the injury has had on Petitioner has been debilitating. *Id*.

III.   **Expert Reports**

   *a.  Petitioner's Expert Report*

Petitioner submitted an expert report prepared by Dr. Daniel Carr, a board-certified orthopedic surgeon. Ex. 11 at 1. Dr. Carr obtained his medical degree from the University of Vermont in 1980. *Id*. He thereafter completed a one-year surgical internship at the University of Utah, and completed his orthopedic residency in 1985. *Id*. He began his professional career in orthopedic sports medicine in Huntington, West Virginia at the Scott Orthopedic Center. *Id*. His concentration was sports injuries, trauma, and injuries of the shoulder. *Id*. He states that he has treated thousands of shoulder injuries over his nine years in Huntington, West Virginia, and has experience treating both vaccine and non-vaccine related injuries during his career. *Id*. Dr. Carr is retired, but currently volunteers at a local free medical clinic treating orthopedic injuries, including chronic shoulder injuries. *Id*.

In preparing his report, Dr. Carr stated that he reviewed the affidavits, Respondent's Rule 4(c) Report, the pre-vaccination emergency and urgent care records, the primary care records, orthopedic records, as well as the x-ray reports of Petitioner's cervical spine and two MRI reports of the left shoulder. Ex. 11 at 1. He also reviewed Ms. Teufel's physical therapy records, but never examined Petitioner in person. *Id*.

In considering Ms. Teufel's past medical history, Dr. Carr notes that Ms. Teufel went to the emergency room (urgent care) in March 2016 (six months before the relevant vaccination) with complaints of left sided neck pain and left posterior shoulder discomfort. Ex. 11 at 2. Dr. Carr posits that her symptoms were secondary to her neck arthritis and remote from her shoulder symptoms post-vaccination. *Id*. After this emergency room visit, Ms. Teufel was given pain medication, and she had no further complaints related to her left shoulder symptoms. *Id*.

Thus, in Dr. Carr's view, Ms. Teufel was symptom-free when she received her flu vaccine on September 22, 2016. He opines that the flu vaccine was "the only plausible etiology of her continuous symptoms." Ex. 11 at 3. According to Dr. Carr, the degenerative changes, partial rotator cuff tears, labral fraying and bone spurs seen on the MRIs were common symptoms and asymptomatic, as is typical in individuals over the age of 65. However, according to Dr. Carr, trauma, such as an improperly placed vaccination, can stimulate latent injuries "to a point of becoming symptomatic." *Id*. He further stated that "[m]uscle and tendon inflammation as well as an inflammatory bursal reaction are two of the most common objective findings reported and documented in the adverse vaccine reaction literature." *Id*.

In responding to the statements made in the Rule 4(c) Report that Ms. Teufel had an existing injury to her left shoulder that explained her current symptoms, Dr. Carr differentiated the pain Ms. Teufel experienced both pre and post vaccination. Ex. 11 at 3. He emphasizes that the pre-vaccination pain occurred in/emanated from the neck and trapezius, not the rotator cuff or deltoid. *Id*. Dr. Carr states that it is important to differentiate between neck and shoulder pain. *Id*. at 4. He was satisfied that the physicians who attended to Ms. Teufel in the emergency room in March 2016 considered unidentified arthritis of the cervical spine and correctly identified Ms. Teufel's pain that originated from her neck (as confirmed by MRI) and was not consistent with shoulder pathology. *Id*. He concluded that "to the best of medical certainty, . . . Ms. Teufel suffered an adverse reaction to her shoulder as a result of the influenza vaccine she received on September 22, 2016. *Id*.

### b.  Respondent's Expert

Respondent submitted an expert report and curriculum vitae prepared by Dr. Brian Feeley, also a board-certified orthopedic surgeon. Ex. A at 1. Dr. Feeley received his Bachelor of Science (BS) from Stanford University in 1996, and his medical degree (MD) from Stanford in 2001. *Id*. He completed an orthopedic residency from the University of California, Los Angeles, with a focus on research in 2007, and completed a sports medicine and shoulder fellowship at the Hospital for Special Surgery in New York in 2008. *Id*. He has been practicing orthopedic surgery at the University of California, San Francisco since 2008, and is currently a professor in residence and Chief of the Sports Medicine and Shoulder Service at the university. *Id*.

Dr. Feeley has published over 170 peer-reviewed manuscripts, several review papers and book chapters, including authoring a chapter on shoulder rotator cuff tears. Ex. A at 1. He also runs an NIH-funded lab to study muscle changes and stem cell activity after shoulder injuries. *Id*. He has treated over 600 patients with shoulder bursitis, shoulder instability, and adhesive capsulitis in the last five years. *Id*.

Dr. Feeley's expert report begins with an overview of his medical background, followed by a summary of the medical records he reviewed and an overview of common shoulder pathologies. Ex. A at 2-5. He also discusses how shoulder arthritis occurs in the deltoid. *Id*. at 6.

A section of his report is dedicated to discussing cervical radiculopathy, which is a "condition where there is compression on the cervical nerve roots as they exit the spine and begin to traverse down the neck into the upper extremities." Ex. A at 7. He described that the presentation of pain could start with the neck but depended on the involved nerve root. *Id*. Compression of nerve roots proximally at the C4-C5 level may involve the

shoulder girdle. *Id*. Pain may be the predominant presentation of this type of compression. *Id*.

Regarding Ms. Teufel's pre-vaccination urgent care visit on March 1, 2016, Dr. Feeley noted that Petitioner's symptoms "are more consistent with a cervical spine etiology, as is her subsequent complaint that she was losing her balance further along in her treatment course." Ex. A. at 8. He further noted that a loss of balance is rare with shoulder pain, but a common consequence of cervical spine myelopathy, where loss of balance is a hallmark sign. *Id*.

Dr. Feeley also noted that Petitioner had a gradual progression of glenohumeral arthritis, as is documented on her MRI. Ex. A. at 8. He stated that this type of pain could have caused her progressive shoulder-localized pain that would not have responded to subacromial injections. *Id*.

Dr. Feeley then analyzed the current scientific medical literature linking vaccination to shoulder injuries, noting that the amount of literature is "relatively limited." Ex. A. at 8. Dr. Feeley stated that a needle placed into the subacromial space is unlikely to result in a rotator cuff tear. *Id*. at 9. He cited to a position presented by the American Academy of Orthopedic Surgeon that implied that there is a high risk of erroneous diagnosis, and that vaccine administration is merely coincidental with the onset of common shoulder pathologies. *Id*. at 9-10.

In reviewing Dr. Carr's report, Dr. Feeley agreed that the findings that are described in the MRIs (i.e., degenerative changes, partial cuff tears, labral fraying, and bone spurs within her acromion) represent common and usually asymptomatic pathology. Ex. A at 10. He disagreed, however, that the source of Petitioner's pain was bursal inflammation due to increased shoulder inflammation. *Id*. Because Petitioner did not respond with appropriate relief to the corticosteroid injections into the bursal space, Dr. Feeley opined, any bursitis that existed had likely resolved over time and did not contribute to her ongoing left shoulder pain. *Id*.

Dr. Feeley also allowed that symptoms and pain related to Petitioner's neck and cervical pathology presented differently than the symptoms involving her shoulder. Ex. A at 10. He agreed that "subsequent visits suggest that the pain she was experiencing was not from the shoulder," but rather suggested a cervical etiology which contributed to her symptoms of pain. *Id*. Dr. Feeley noted that although Petitioner's orthopedist did not follow up with ordering a cervical MRI, the failure to do so should not be interpreted as meaning there was no cervical etiology. *Id*. Rather, Dr. Feeley stated, the next logical step would have been to order a cervical MRI to further evaluate the source of Petitioner's pain. *Id*.

Dr. Feeley concluded his report by stating that it was unlikely in his opinion that the flu vaccine caused Petitioner's shoulder pain. Ex. A. at 10. He identified the fact that Petitioner had symptoms of neck pain, radicular symptoms, and loss of balance which are more suggestive of neck pathology with documented significant degenerative and congenital neck symptoms. *Id*. He also stated that the MRI findings were not supportive of a vaccine-related injury as they did not document considerable bursitis, but rather demonstrated progressive glenohumeral arthritis progression. In addressing the timing of the injury respective to the date of vaccine administration, Dr. Feeley inferred that because Ms. Teufel did not immediately complain of shoulder pain, i.e., within 24-48 hours of vaccination, that she "d[id] not meet the timing of a SIRVA injury." *Id*. at 10.

## IV.    Parties' Respective Arguments

Petitioner argues that the medical records, affidavit, and Dr. Carr's expert report all clearly demonstrate that she suffered a SIRVA injury following receipt of the flu vaccine on September 22, 2016 – an injury independent from, and unrelated to, her prior complaint of neck and trapezius pain on March 1, 2016. Mot. at 1. Respondent argues that Petitioner's claim fails because the onset of her shoulder pain did not occur within 48 hours of vaccination – rather, Petitioner had a prior history of left shoulder pain. Thus, two Table SIRVA injury requirements cannot be met (onset plus no evidence of a prior explanatory issue). Opp. at 1.

## V.    Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule

does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical

records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## VI.  Analysis

### I.  Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

---

[6] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine

Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

### 1. Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). This is the most hotly contested issue raised by Respondent – and although he has raised reasonable points, the evidence preponderantly supports the conclusion that any pre-vaccination symptoms were not likely related to what Petitioner experienced post-vaccination.

The specific language of the relevant QAI portion states that there must be "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i). But Ms. Teufel's medical history does not evidence pre-vaccination explanatory "pain, inflammation or dysfunction."

Thus, in March 2016, Ms. Teufel presented to urgent care with complaints of left sided neck pain, which radiated to her left shoulder. Ex. 5 at 14. At the time she was examined, she complained that she had been experiencing this moderate pain for the prior three weeks. The physician that examined her noted "[l]eft trapezius muscle" pain and tenderness. *Id.* There was no tenderness of the left upper arm noted and Ms. Teufel had active range of motion of the left shoulder. She was prescribed Tylenol-Codeine and discharged. Ex. 5 at 15. She had no further complaints of left neck or shoulder pain prior to vaccination.

Dr. Carr opined that these symptoms were secondary to neck arthritis, rendering them distinguishable from the shoulder symptoms reported after vaccination. Ex. 11 at 2. In support, he notes that Ms. Teufel had no further complaints of left shoulder or neck

pain after March 2016, and thus these earlier complaints had very likely resolved prior to vaccination. *Id*. He also explains that while Ms. Teufel likely had some of the symptoms that were shown on MRI prior to vaccination, i.e., degenerative shoulder changes, partial rotator cuff tears, labral tearing, and bone spurs, these conditions were asymptomatic in Ms. Teufel prior to vaccination. His assessment is therefore that the vaccine had stimulated these latent injuries "to a point of *becoming* symptomatic." Ex. 11 at 3 (emphasis added). He also observed that Ms. Teufel was examined in the emergency room in March 2016, but the physician that examined her correctly identified Petitioner's pain as coming from her neck and not her shoulder, further distinguishing the earlier symptoms. *Id*. at 4.

Respondent's expert, Dr. Feeley, agrees that Ms. Teufel exhibited symptoms that presented as glenohumeral arthritis prior to vaccination. However, he states that these symptoms could have caused pain that progressed to shoulder-localized pain, and that this type of pain was thus likely the cause of Ms. Teufel's pain post vaccination. He notes that Ms. Teufel complained of loss of balance, and that her pain did not respond well to cortisone injections, which would be the case if Petitioner was experiencing cervical pain as opposed to localized shoulder pain. Ex. A at 10.

I credit Dr. Feeley's assessment and note his findings that Ms. Teufel did not respond well to the cortisone injections. But her symptoms and presentation both before and after vaccination are markedly different – and the distinction is evident from the record itself. I also find significant the fact that after the urgent care visit in March 2016, Ms. Teufel did not seek further treatment for her shoulder prior to vaccination, which also suggests that her pain was resolved. And she chose the previously affected left shoulder as a site of vaccination, further establishing that her prior symptoms had likely completely resolved. In addition, Ms. Teufel was examined by a physician, Dr. Black, while in urgent care in 2016, who concluded that Petitioner had left trapezius pain that was likely causing her symptoms. Neither Dr. Carr nor Dr. Feeley examined Ms. Teufel in person, and thus, Dr. Black's assessment warrants some additional weight.

Dr. Feeley also notes that Ms. Teufel did not respond to the cortisone injections that she received to her left shoulder, but that is not entirely accurate. Ms. Teufel in fact did experience some relief, although that relief was not long-lived. The mere fact that she received six such injections is telling, as it is unlikely she would have continued to receive those injection if they provided no benefit.

The evidence thus shows that Ms. Teufel became asymptomatic and without any shoulder or neck symptoms prior to vaccination, despite her one instance of seemingly-related pain (which in fact is likely distinguishable) – but then, almost immediately after

vaccination, began to experience left shoulder pain. While temporal association alone is not enough to make a causal connection between injury and vaccination, it does help to support Petitioner's Table claim in this case, since it is consistent with onset requirements.

Dr. Feeley also reasonably speculated that Ms. Teufel's complaints of loss of balance are a "hallmark" feature of cervical spine myelopathy, in reaction to the counter-contention that Ms. Teufel's left shoulder pain led to overuse of other muscles that may have simply flared pain in her cervical spine. But no cervical spine MRI was conducted to support Dr. Feeley's claim that Petitioner's cervical spine was the main source of her shoulder pain. Thus, while Dr. Feeley's opinion on this alternative cause is not without merit, it is not sufficiently substantiated to rebut the other evidence supporting the SIRVA injury as unrelated to any other possible condition.

Thus, in reviewing all the evidence as a whole, including the expert reports, I find that Petitioner had no history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection. The first SIRVA criterion is met.

## 2. Pain Occurs with the Specified Timeframe (Onset)

Regarding onset of Petitioner's pain, in order to meet the definition of a Table SIRVA, a petitioner must show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and that her pain occurred within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

Respondent first raised this issue in his response to Petitioner's Motion for Ruling on the Record. His only argument regarding this criterion is that "the contemporaneous medical records do not establish that the onset of petitioner's shoulder pain occurred within the requisite 48 hours of her September 22, 2016 flu vaccination. Therefore, petitioner does not have a Table SIRVA injury." Opp. at 6. Respondent does not cite to any specific records and makes no further argument regarding this point, however – and in fact his contention is in error.

Ms. Teufel averred, and the records confirm, that she received a flu vaccine in her left shoulder on September 22, 2016, at One Hanson Pharmacy in Woodbridge, Virginia. Ex. 1 at 1. She explained that the vaccine "was administered high in my left arm/shoulder and I felt severe pain immediately which intensified in the hours following administration of the vaccine." *Id.*

On October 18, 2016, less than one month after vaccination, Ms. Teufel presented to Dr. Erica Winslow at Doctors Express Urgent Care/Family Care for complaints of chest pain, hiccups, and fatigue, but also mentioned that she had received a flu shot "*and site still tender*." Ex. 5 at 4 (emphasis added). This provides some support, if weak, for an onset contemporaneous with vaccination.

Then, on approximately November 2, 2016, Ms. Teufel presented to her primary care physician, Dr. Ulrich Prinz, during which Dr. Prinz noted that Petitioner had been seen in urgent care for chest pain, but had also "developed L shoulder pain" *upon receiving the flu vaccine in September 2016* and that she could not sleep on her left side as a result." Ex. 6 at 8 (emphasis added). This more directly connects onset with the time of vaccination.

Finally, on November 9, 2016, Ms. Teufel was seen by orthopedist Dr. Avery, who noted that Petitioner "had a flu shot in September which she attributes to the cause of her pain." Ex. 7 at 7. In October 2017, Dr. Avery notes state "[h]er pain began *after receiving a flu shot 1 year ago.* Her pain is persistent." Ex. 6 at 30 (emphasis added). While "after" is not as specific as possible, it is consistent with the prior records – and with the conclusion onset occurred within 48 hours of vaccination.

Ms. Teufel was seen fairly quickly for complaints of shoulder pain after vaccination, i.e., less than a one-month period. Any delay in seeking treatment herein is not notably lengthy, and thus, not inconsistent with what other Program petitioners experience, based on the assumption that their pain is likely transitory. Many SIRVA cases feature medical record notations from physicians recommending that a patient wait a period of time after vaccination to allow time for the shoulder pain to fade before seeking treatment. Subsequent records corroborate the injury and onset, and the Vaccine Act expressly does not obligate claimants to prove onset issues with evidence from *within* the alleged timeframe in any event. Section 13(b)(2).

In reviewing all these statements, there is not a single statement that places the onset of Ms. Teufel's shoulder pain outside the 48-hour window. The lack of any contradictory statement weighs in Petitioner's favor and supports a finding that her left shoulder pain began within 48-hours of vaccination. Thus, Petitioner has fulfilled this criterion.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to her Left Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the

intramuscular vaccine was administered." Respondent has not contested this criterion, and I find that all the evidence presented supports a finding that Ms. Teufel's pain and reduced range of motion was limited to her left shoulder.

### 4.  There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). While Respondent does not explicitly contest this criterion, I will briefly address it, as some of the arguments raised by Respondent discussed above bear on this issue.

Respondent's expert opined that Ms. Teufel's symptoms both pre and post-vaccination "are more consistent with cervical spine etiology…" Ex. A at 8. Dr. Feeley notes that Petitioner's issues with balance is a hallmark sign of cervical spine myelopathy, and that there is a gradual progression of glenohumeral arthritis as documented in the MRI. *Id*. However, this argument and assessment is partly based on speculation, because Ms. Teufel never underwent a cervical MRI, although one was ordered. And it is not Petitioner's burden to rule out all the possible alternative causes that Respondent may raise (even if they are reasonably considered in evaluating a claimant's success).

The relevant SIRVA criterion states that a condition or abnormality must be *present that would explain her symptoms* (emphasis added). There is no evidence in the record confirming any cervical spine injury, and there is no evidence that any of the conditions found on the MRI were present before vaccination that would lead Petitioner's shoulder symptoms after vaccination. I have already found that Ms. Teufel had no left shoulder symptomology prior to vaccination that would have contributed to her shoulder symptoms after vaccination. Thus, I find there is no other condition or abnormality present that would explain Petitioner's symptoms.

### B.  Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on September 22, 2016. Ex. 4 at 2-3; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United

States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 3; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from September 24, 2016 (48 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of her shoulder injury for more than six months. *See*, *e.g.*, Ex. 7 at 18-19 (Petitioner's second MRI report on October 20, 2017); Ex. 6 at 28 (records of Petitioner's appointment with Dr. Avery). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## VII.    Conclusion and Damages Order

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase.**[7]

---

[7] The parties are reminded that in Vaccine Act cases, damages issues are typically resolved collaboratively. Therefore, the parties should begin actively discussing the appropriate amount of compensation in this case. In many cases, damages can be resolved by Petitioners communicating a demand to Respondent, who may agree to the demand or may make a counter-offer.

The parties shall not **retain a medical expert, life care planner, or other expert without consulting with each other and the Chief Special Master.** If counsel retains an expert without so consulting in advance, reimbursement of those costs may be affected.

Petitioner shall file a status report updating on the parties' progress towards informally resolving damages by no later than <u>Thursday, December 22, 2022</u>.

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master